# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE P3 HEALTH GROUP HOLDINGS, LLC | ) ) | Consol. C.A. No. 2021-0518-JTL |

## MEMORANDUM OPINION

Date Submitted: July 13, 2022
Date Decided: October 31, 2022

Bruce E. Jameson, Corinne Elise Amato, Eric J. Juray, Elizabeth Wang, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Craig Carpenito, Richard H. Walker, Samuel C. Cortina, KING & SPALDING LLP, New York, New York; *Counsel for Hudson Vegas Investment SPV, LLC*.

William M. Lafferty, Kevin M. Coen, Ryan D. Stottmann, Sara Toscano, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Jessica Puathasnanon and P3 Health Group Holdings, LLC*.

Kevin R. Shannon, Christopher N. Kelly, Daniel M. Rusk IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William K. Kane, J, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Chicago, Illinois; James C. Wald, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Los Angeles, California; *Counsel for Chicago Pacific Founders Fund, L.P., CPF P3 Splitter, LLC, Greg Kazarian, Larry Leisure, Mary Tolan, and Sameer Mathur*.

Elena C. Norman, Paul J. Loughman, Lakshmi A. Muthu, Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; *Counsel for Sherif W. Abdou, Amir Bacchus, Gary Garrett, Lorie Glisson, Taylor Leavitt, and Tom Price*.

**LASTER, V.C.**

Hudson Vegas Investment SPV, LLC ("Hudson") was a minority investor in P3 Health Group Holdings, LLC (the "Company" or "P3"). In this litigation, Hudson asserts various claims based on a business combination between the Company and a special purpose acquisition company, commonly known as a SPAC.

In Counts I–IV of its complaint, Hudson asserts claims for breach of the Company's limited liability company agreement (the "LLC Agreement"). Hudson brings those claims against the SPAC, the Company, and the Company's controlling investor, Chicago Pacific Founders Fund, L.P ("Chicago Pacific"). Each has moved to dismiss under Rule 12(b)(6), arguing that none of Hudson's theories state claims on which relief can be granted.

The SPAC is not a party to the LLC Agreement, so its motion is granted. Chicago Pacific is a party to the LLC Agreement in its capacity as a member, but does not owe any of the obligations that Hudson seeks to enforce. Its motion is granted also.

The outcome for the Company is mixed. Hudson contends that the Company breached the LLC Agreement in fourteen different ways:

- Three theories focus on the composition of the board of directors of the post-merger entity.

- One theory focuses on an alleged agreement to combine the Company with another Chicago Pacific portfolio company.

- Two theories focus on Hudson's right to a first-priority distribution of $50 million.

- Four theories focus on the use of blocker transactions to enable Chicago Pacific to obtain favorable tax treatment for part of its share of the merger consideration.

- Two theories focus on the Company's refusal to honor an option that entitles Hudson to buy additional equity in the Company.

- Two theories focus on how Hudson's representatives on the Company's governing board were treated during the process that led to the merger.

Some of Hudson's claims survive pleading-stage analysis. Others are dismissed.

## I.    FACTUAL BACKGROUND

The facts are drawn from the currently operative complaint and the documents it incorporates by reference. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.[1]

### A.    The Company

Before the transaction challenged in this litigation, the Company was a Delaware LLC that engaged in the business of population healthcare management. That concept involves providing administrative support to physicians and other healthcare providers so that patients receive more cost-effective healthcare. At the time of the events giving rise to this litigation, the Company conducted business in Nevada, Arizona, Florida, and Oregon.

Chicago Pacific is a private equity fund focused on the healthcare industry. Before the transaction challenged in this litigation, the Company was one of Chicago Pacific's portfolio companies. The fund provided the initial capital for the Company and referred

---

[1] Citations in the form "Ex. —" refer to documents attached to the amended complaint. Citations in the form "AC ¶ —" refer to allegations in Hudson's amended complaint. Citations in the form "PX __" refer to exhibits from Hudson's previous motion for a preliminary injunction.

to itself as the Company's founding investor. The fund held Class A units that carried special governance rights, including the right to appoint members to the Company's board of managers (the "Board"). Through a combination of governance rights, Board representation, and other sources of influence, Chicago Pacific controlled the Company.

Sherif W. Abdou and Amir Bacchus are physicians and entrepreneurs who co-founded the Company. Abdou became CEO. Bacchus took on a senior officer role that the complaint does not identify. They held Class B units that gave them the right to appoint two members of the Board. They appointed themselves.

The Company issued Class C units to other members of the Company's management team. The holders of those units had the right to appoint one manager. They appointed a Company executive named Lorie Glisson.

In 2019, Hudson invested $50 million in the Company. Hudson describes itself as "a Delaware limited liability company led by a management team with a history of building successful healthcare companies." AC ¶ 6. In return for its investment, Hudson received Class D units that carried special governance rights, including the right to designate two members of the Board. Hudson designated John Bradburn and Joseph Straus (the "Hudson Managers").

In 2020, Leavitt Equity Partners acquired a portion of Chicago Pacific's Class A units. Chicago Pacific agreed that Leavitt could designate one of the managers allocated to the Class A units. Taylor Leavitt became that manager.

During the time relevant to the complaint, Chicago Pacific had the right to appoint five members of the Board (the "Chicago Pacific Managers"). Chicago Pacific appointed

three principals of the fund: Greg Kazarian, Mary Tolan, and Larry Leisure. Chicago Pacific also appointed two outsiders: Gary Garrett and Tom Price. Two of the Chicago Pacific Managers held positions that gave them additional authority: Tolan served as Chair of the Board, and Kazarian served as the Company's Chief Strategic Officer.

## B. The Original Deal Structure

In August 2020, the Company began exploring ways to access the public markets. On September 1, various representatives of the Company, including several members of the Board, held a Zoom meeting to review the Company's strategic alternatives.

One of the strategic alternatives was to combine the Company with another Chicago Pacific portfolio company known as MyCare. The combined company would have greater scale and could access the public markets more effectively than either company alone.

On November 1, 2020, Abdou, Bacchus, and Tolan met with Greg Wasson, the former CEO of Walgreens, about a transaction with a SPAC that Wasson would sponsor through his family office. The distinction between Wasson and his family office is not important to this decision, which for simplicity refers to Wasson.

By late November 2020, the Company, Chicago Pacific, and Wasson were discussing a potential three-way merger involving the Company, MyCare, and a Wasson-sponsored SPAC (the "Original Deal Structure"). They entered into a non-disclosure agreement, shared confidential information, and developed detailed financial models for the post-transaction company.

4

By December 2020, the Company, Chicago Pacific, and Wasson were ready to move forward with the Original Deal Structure. *Id.* ¶ 32. Until this point, no one had shared the details of the proposed combination with the Hudson Managers, even though Hudson was the Company's second largest investor and had two representatives on the Board. The LLC Agreement also required Hudson's consent for any transaction between the Company and Chicago Pacific or one of its affiliates. Because the Original Deal Structure envisioned a transaction with MyCare, the LLC Agreement required Hudson's consent before the Company could proceed. Yet it was not until December 28, 2020, that Chicago Pacific sent a description of the Original Deal Structure to Hudson. The next day, Kazarian provided one of the Hudson Managers with additional analysis.

On January 4, 2021, Hudson provided its feedback. In a nutshell, Hudson felt that the Original Deal Structure overvalued MyCare relative to the Company. Hudson made counterproposals on various points, including valuation.

The Chicago Pacific Managers next brought the proposal for the Original Deal Structure to the full Board. Recall that because the Original Deal Structure contemplated a transaction between the Company and an affiliate of Chicago Pacific, the LLC Agreement required Hudson's consent before the Company could proceed. Believing that the Original Deal Structure continued to overvalue MyCare relative to the Company, Hudson withheld its consent.

Around the same time, Wasson formed a SPAC called Foresight Acquisition Corp. ("Foresight"). Later that month, Foresight filed its Registration Statement on Form S-1, and its shares began trading publicly on NASDAQ under the ticker symbol "FORE."

5

## C. The New Deal Structure

With the original deal blocked, Chicago Pacific, the Company, and Foresight began working on an alternative transaction. They decided to pursue a combination that only involved the Company and Foresight (the "New Deal Structure"). By dropping MyCare, the New Deal Structure avoided the obvious trigger for Hudson's consent right. But Chicago Pacific, Foresight, and the Company remained interested in combining the Company with MyCare. They contemplated accomplishing that step in a follow-on transaction, after using the merger between the Company and Foresight to eliminate Hudson's protective rights.

On February 15, 2021, the Company and Foresight executed a non-disclosure agreement. On February 19, the Company opened a data room for Foresight. No one told the Hudson Managers.

On March 4, 2021, Foresight sent a proposed letter of intent to Tolan. The next day, a Foresight representative contacted Tolan to negotiate its terms. No one told the Hudson Managers.

Around the same time, the Company engaged JPMorgan Chase & Co. ("JPMorgan") as its financial advisor and Latham & Watkins LLP ("Latham") as its outside counsel. On March 5, 2021, JPMorgan provided a timeline for a de-SPAC merger to representatives of Chicago Pacific and the Company. JPMorgan did not share the timeline with the Hudson Managers.

JPMorgan recommended that the Company engage with other SPACs in the healthcare sector to create competition for Foresight. *Id.* ¶ 40. The Company and Chicago

Pacific disregarded that advice. They made half-hearted contact with two other sponsors while focusing on negotiating the letter of intent with Foresight. Tolan even told Foresight that JPMorgan was pushing the Company to "take a look" at other SPACs and that Foresight could put pressure on the Company by demanding exclusivity. *Id.* ¶ 41. She also told Foresight that she was "very comfortable" giving Foresight two or three board seats in the post-transaction entity. And she expressed interest in using the New Deal Structure to eliminate the special governance rights that Hudson possessed. *Id.*

On March 11, 2021, Foresight demanded exclusivity, just as Tolan had suggested. *Id.* ¶ 42. The next day, Abdou sent an email to the Board stating that he would be signing an exclusivity agreement with Foresight. *Id.* Three Board members replied that they supported the move; two were Chicago Pacific Managers and the third was Leavitt. Abdou saw no need to wait for more input. He wrote back, "hearing no objections, we are in exclusive discussions with a [sic] [F]oresight, Inc., effective noon pacific time today for a period of two calendar weeks." PX 67 at '944. The Hudson Managers never had a meaningful chance to weigh in on the exclusivity agreement.

Over the next two weeks, Chicago Pacific led the negotiations of the letter of intent. AC ¶ 46. JPMorgan commented internally that Foresight made heavy-handed demands, while Chicago Pacific offered ineffective responses. JPMorgan perceived that Foresight either had inside information about Chicago Pacific's commitment to a deal or was overly confident. JPMorgan believed that the solution was to introduce competition. *Id.* ¶ 45. But Chicago Pacific focused on Foresight.

While the negotiations were ongoing, the Hudson Managers repeatedly asked to see any draft letter of intent from Foresight, but the Company did not share it. *Id.* ¶ 43. Viewing the Hudson Manager's interest as a problem, Chicago Pacific asked JPMorgan and Latham to evaluate how Hudson's rights under the LLC Agreement would apply to the New Deal Structure. *Id.* ¶ 65; PX 69 at '245. In addition to various consent rights, the LLC Agreement granted Hudson the right to purchase additional units if the Company raised capital "through the primary method of selling Equity Securities." AC ¶ 24; Ex. 1 § 3.10(a) (the "Preemptive Option"). Chicago Pacific wanted Latham to opine that the New Deal Structure would not trigger the Preemptive Option.

## D. The Letter Of Intent

On March 25, 2021, Jessica Puathasnanon, the Company's Chief Legal Officer, circulated a proposed letter of intent to the Board. Puathasnanon's email contained three bullet points describing some of the negotiations. She asked the Board to approve the letter of intent. *See* AC ¶ 49.

The letter of intent contemplated a forward merger between the Company and a subsidiary of Foresight in which the Company's existence as a separate entity would cease. With the cessation of the Company's existence, the rights that Hudson enjoyed under the LLC Agreement would terminate. The governing documents for the post-transaction entity did not provide Hudson with comparable rights and protections.

The letter of intent ascribed a valuation of $3.3 billion to the post-transaction entity. Foresight had no operating business; it only had cash on its balance sheet. As modeled under the letter of intent, the Company would receive $180 million in cash by

8

merging with a Foresight subsidiary. The letter of intent also contemplated that the Company would raise between $400 million and $500 million through a private investment in public equity ("PIPE"). Under the terms of the letter of intent, the principal purpose of the New Deal Structure was to raise capital. *See id.* ¶¶ 31, 49, 52, 68.

Four hours after Puathasnanon circulated the letter of intent, Abdou sent a follow-up email to the Board. By that point, only Kazarian, one of the Chicago Pacific Managers, responded affirmatively with a "yes." Abdou told the Board that "time is of the essence" and stated that as a result, he "[would] take [the Board's] lack of response as implicit approval." PX 88.

Abdou signed the letter of intent at the end of the day on March 25, 2021. He also gave Foresight an extension of its exclusivity arrangement until April 30. AC ¶ 48.

The next day, the Hudson Managers objected to the letter of intent. They also asserted that by proposing the letter of intent, the Company had given "constructive notice of an eligible capital raise" that triggered the Preemptive Option. PX 92.

Kazarian, Puathasnanon, and Latham began working on a response to Hudson's objections. They also sought to characterize the New Deal Structure in a way that would avoid triggering the Preemptive Option. Tolan told the team that Hudson would not be able to exercise the Preemptive Option based on the de-SPAC merger and that they could "take it to the bank." AC ¶ 53.

On March 23, 2021, Latham sent Chicago Pacific and various Company insiders a memorandum which argued that the de-SPAC merger would not trigger the Preemptive Option. To bolster the chances of that outcome, Latham recommended that the Board

9

adopt a resolution characterizing the New Deal Structure as a "strategic transaction," which would bring the transaction within an exception to the Preemptive Option. PX 103. Latham did not send its analysis to the Hudson Managers. AC ¶ 54.

On March 29, 2021, Latham circulated a draft letter for the Company to send to Hudson. *Id.* ¶ 55. The draft letter asserted that the New Deal Structure would not trigger the Preemptive Option and attached a draft resolution characterizing the New Deal Structure as a "strategic transaction." PX 103.

After reviewing the draft, Puathasnanon pointed out that the documents continued to refer to the transaction as a "capital raise." *Id.* She noted that the language "could be used against us" and suggested that it be removed. *Id.* But it was impossible for Chicago Pacific and the Company to dance around the fact that the de-SPAC merger was designed to raise capital. When Latham followed Puathasnanon's instructions and altered the resolution to recite that the Company was "not seeking to raise capital in the Transaction," Tolan responded that "the statements that we are not raising capital will be picked at if there is any capital going on [the] balance sheet." AC ¶ 57. She further explained that "[i]n a go public the investors prefer to see money going on [the] balance sheet and therefor[e] some of this will be done to have the buy in the public long only shareholders on the offering [sic]." *Id.* Tolan thus recognized that the de-SPAC merger needed to be pitched to public investors as a capital raise, even if the lawyers tried to claim otherwise.

Chicago Pacific, Company management, and Latham planned to hold a Board meeting on April 2, 2021, so the Board could approve the resolution deeming the de-

SPAC merger to be a "strategic transaction." Kazarian did not want the Hudson Managers to receive the same information about the resolution, so in an email sent on March 30, Kazarian instructed Puathasnanon to provide the Hudson Managers with a "short" memorandum about the deal, rather than the "long" one that would go to the other managers. *Id.* ¶ 48.

On March 31, 2021, Puathasnanon noticed the April 2 meeting. The notice attached the proposed resolution. That was the first time that the Hudson Managers received a copy of the proposed resolution and heard about the concept of the de-SPAC merger being a strategic transaction. *Id.* ¶ 60.

During a meeting on April 2, 2021, a majority of the Board adopted the resolution declaring that the de-SPAC merger was a strategic transaction. The Hudson Managers objected and stated that Hudson was exercising the Preemptive Option. *Id.* ¶ 63.

### E. Backsheesh For Tolan And Kazarian

An important aspect of the de-SPAC merger was the Company's ability to raise additional financing through the PIPE. *See id.* ¶¶ 31, 49, 68. Chicago Pacific principals handled nearly every aspect of the PIPE. The letter of intent contemplated a PIPE of $400 to $500 million.

In April 2021, the SPAC market began to weaken. JPMorgan warned Chicago Pacific that the PIPE would top out at $300 to $350 million, nearly one-third less than the letter of intent contemplated. *Id.* ¶ 68. As April unfolded, the SPAC market declined further. By April 29, JPMorgan was telling Tolan that the maximum proceeds had fallen

to $250 million. *Id.* ¶¶ 31, 67. No one provided the information to the Board. Tolan decided to continue moving forward with the de-SPAC merger. *Id.* ¶ 69.

With the Foresight transaction rapidly becoming less attractive to the Company, Wasson took steps to ensure that it remained attractive to Tolan and Kazarian. On April 26, 2021, he gave Tolan and Kazarian the opportunity to invest personally in a follow-on SPAC called Foresight Acquisition Corp. II. Tolan described the invitation as "an honor." *Id.* ¶ 75. Without making any disclosure to the Board, Tolan and Kazarian accepted, and on May 7, 2021, they invested $500,000 and $100,000 in the new SPAC. The complaint alleges that based on historical rates of return to SPAC insiders, Tolan and Kazarian stood to reap nearly $9 million and $5 million, respectively, if the new SPAC completed an acquisition. *Id.*

**F.    Chicago Pacific Pushes The Transaction To A Conclusion.**

During May 2021, Chicago Pacific continued to exercise control over the transaction process. An incident involving Latham revealed the extent of Chicago Pacific's control. In early May, Latham proposed to circulate documents that the Company had approved, but which Chicago Pacific had not yet seen. In a blunt email to Latham, one of the Chicago Pacific representatives made clear who was in charge:

> Not sure why we have a disconnect here. [Chicago Pacific] owns a majority of the Company and so we want to review ALL these docs in parallel. . . . While I know you view [the Company's Chief Legal Officer] as your client, [Kazarian]/I should be part of this process as well.

> In short, I would advise that no docs go to Foresight/[Foresight's counsel] without [Chicago Pacific] sign off. . . .

Also, what other drafts have you shared with the Company that . . . I have not seen yet[?]

PX 120 at '190. Latham capitulated and promised to "hold off on sending docs to [the] broader group." *Id.*

On May 5, 2021, representatives from the Company, Chicago Pacific, and Foresight met to work through the final business issues. No one suggested including the Hudson Managers, even though they had asked to be involved in the negotiations.

It was only after the key meeting on May 5, 2021, that Chicago Pacific and the Company's officers began planning to provide curated information to the Hudson Managers. On May 6, 2021, Puathasnanon advised Abdou, Bacchus, Tolan, Kazarian, and Latham that "we should start providing the full Board with detailed information about the transaction so that when it comes time for a formal vote . . . everyone is well-informed and able to vote accordingly." PX 123. Her email recognized that the full Board, including the Hudson Managers, was not receiving detailed information about the transaction.

Later in May 2021, JPMorgan advised Chicago Pacific, the Company, and Foresight that the PIPE could raise as little as $140 million. AC ¶ 70. That projection reflected a decline of roughly $300 million, or two thirds, from the level contemplated in the letter of intent. *Id.* Another blow to the transaction arrived on May 14, when Foresight reduced the value it ascribed to the post-transaction entity from $3.3 billion to $2.3 billion. The new valuation represented a decline of approximately $1 billion—or nearly a third—from the original valuation presented to the Board in the letter of intent. *Id.* ¶ 71.

13

No one shared this information with the Hudson Managers or the full Board. Chicago Pacific and Company management moved forward on their own.

## G. The Board Approves The Merger.

On April 29, 2021, Company management had informed the Board that the Company intended to engage in a de-SPAC merger with Foresight. For four weeks, the Board did not receive any meaningful information about the transaction. *Id.* ¶ 76.

Nearly one month later, on May 20, 2021, the Company noticed two meetings for the Board to consider the proposed merger. The first meeting was scheduled for the next day. The second meeting was scheduled for May 23. The plan was for the Board to approve the merger at the second meeting. *Id.* ¶ 77.

The email that provided notice of the meetings included an executive summary describing the merger, a deck explaining the steps involved in implementing it, and the current draft of the merger agreement. The materials described a complex "Up-C" transaction structure involving multiple steps. The materials noted that the Company would merge with and into a newly formed LLC ("MergerCo") that was a subsidiary of Foresight. Notably, MergerCo would be the surviving entity. Depending on the class of units that each member held, the merger consideration would consist of a combination of cash, units in MergerCo, and publicly traded shares of Foresight.

The May 20, 2021, email was the first time that Hudson learned about the details of the New Deal Structure. It was also the first time that Hudson learned about the shrunken PIPE and the reduced valuation for the post-transaction entity. *Id.* ¶ 78–79.

14

The Hudson Managers asked a series of questions. Confronted with their concerns, the Board decided to delay the vote on the merger and scheduled an additional meeting for May 25, 2021.

At 1:41 a.m. on May 25, 2021, the Company circulated the final deal documents. The Board meeting was scheduled to start at 7:00 a.m., less than six hours later. The documents identified two self-described "material" changes to the transaction. The Company also disclosed that it had yet to complete its 2020 audit and that Foresight had the right to walk from the deal if there were serious problems with the audit. *Id.* ¶ 80.

During the meeting, a majority of the Board approved the merger. The Hudson Managers abstained, citing a lack of time to review the final documents. *Id.* ¶ 82.

**H.      The Court Declines To Grant A Preliminary Injunction.**

On June 11, 2021, Hudson filed this lawsuit and sought a preliminary injunction against the merger. The parties conducted expedited discovery, and Hudson submitted its preliminary injunction application.

On September 14, 2021, the court denied Hudson's request for a preliminary injunction. The court held that Hudson had failed to show a reasonable likelihood of success on any claim that could not be addressed after closing. Hudson also failed to make the showing of irreparable harm necessary to support an injunction.

**I.      The Merger Closes.**

After the denial of the preliminary injunction, Chicago Pacific and the Company pressed forward. The Hudson Managers requested updates about the merger, but did not receive the information they sought. *See id.* ¶¶ 86–88.

For example, Hudson expressed concern about the number of Foresight stockholders who would redeem their shares in the de-SPAC merger. The minimum cash requirements for the merger necessitated that the level of redemptions be no greater than 31.8%. On October 12, 2021, Puathasnanon responded that "the Company does not have any particular insight regarding the redemptions which might be requested by Foresight's stockholders." *Id.* ¶ 86. Puathasnanon also represented that "there have been a few discussions regarding certain terms of the [merger] . . . without coming to any decisions, . . . representatives of Foresight have noted that reducing the minimum cash requirement could reduce the number of redemptions." *Id.* As members of the Board, the Hudson Managers had the right to expect more than that abbreviated response.

During the weeks leading up to the merger, Hudson asked the Company for a spreadsheet showing the flow of funds in the merger. The Company did not provide a spreadsheet until November 26, 2021. *Id.* ¶ 91.

After seeing the distribution waterfall, Hudson objected. Hudson believed that it was entitled to receive a first-priority distribution of $50 million in cash before any other member received any merger consideration. Instead, the distribution waterfall contemplated that Hudson would receive a pro rata distribution of the merger consideration consisting of approximately $3.5 million in cash plus shares of stock in the post-transaction entity. Other members would receive $14.8 million in cash plus shares of stock in the post-transaction entity. Hudson maintained that it was entitled to all of the cash. *Id.* ¶¶ 91–92.

In November 2021, Foresight's accountants expressed concern to Chicago Pacific and the Company about how to characterize the merger for tax purposes. *Id.* ¶ 89. The disagreement caused the Company to extend the closing date by two weeks. *Id.* No one told the Hudson Managers about the accountants' concerns.

While the Company was negotiating with the accountants, a multi-million-dollar investor withdrew from the PIPE. No one informed the Hudson Managers until the night before the merger closed. *Id.* ¶ 90. The Company simultaneously informed Hudson that an astounding 88.18% of Foresight's investors had redeemed their shares rather than supporting the deal. Foresight originally projected that only 15% of its investors would redeem their shares. The withdrawals meant that the minimum cash requirement for consummating the merger was not met. The Board solved that problem by waiving the requirement. *Id.* ¶ 3.

On December 3, 2021, the Company merged with and into MergerCo, with MergerCo surviving as a wholly owned subsidiary of Foresight. Foresight changed its name to P3 Health Partners Inc. To avoid confusion, this decision continues to refer to the entity as Foresight. The post-transaction board of Foresight (the "New Board") has nine seats. Six were filled by members of the Board: Tolan, Kazarian and Leisure from Chicago Pacific, Company co-founders Abdou and Bacchus, and Price, one of the outsiders whom Chicago Pacific appointed. Wasson received a seat, as did an individual named Mark Thierer. One seat was left vacant to be filled later. Hudson did not receive any representation on the New Board. *Id.* ¶ 8.

In conjunction with the merger, a Chicago Pacific affiliate that had owned interests in the Company distributed its interests to two other Chicago Pacific affiliates (together, the "Blocker Entities"). The Blocker Entities then merged with two Foresight subsidiaries, and the surviving entities merged with and into Foresight (the "Blocker Transactions"). Through the Blocker Transactions, Chicago Pacific received a portion of the merger consideration directly from Foresight through a non-taxable exchange. No other investor in the Company received a similar benefit.

## J.     The Current Complaint

After the merger closed, Hudson filed the currently operative complaint. Counts I through IV assert claims against Chicago Pacific, the Company, and Foresight for breaching the LLC Agreement.

- Count I asserts that by effectuating the merger, Chicago Pacific, the Company, and Foresight (i) breached Section 5.1(c) of the LLC Agreement by proceeding without Hudson's consent; (ii) breached Section 6.9 of the LLC Agreement by proceeding without Hudson's consent; and (iii) breached Sections 4.1(c) and 9.3(b) of the LLC Agreement by failing to provide Hudson with the "same form of consideration as other members." AC ¶¶ 97–105.

- Count II asserts that Chicago Pacific, the Company, and Foresight breached the LLC Agreement by refusing to honor the Preemptive Option. In the alternative, Count II asserts that Chicago Pacific and the Company breached the covenant of good faith and fair dealing by refusing to allow Hudson to exercise the Preemptive Option. *Id.* ¶¶ 106–12.

- Count III asserts that Chicago Pacific, the Company, and Foresight breached Section 4.1(b) of the LLC Agreement by failing to pay $50 million in cash to Hudson as a first-priority distribution. *Id.* ¶¶ 113–16.

- Count IV asserts that Chicago Pacific and the Company violated Hudson's right to information by excluding Hudson Managers from the process leading to the merger. *Id.* ¶¶ 117–22.

The complaint contains other counts that this decision does not address.

The defendants responded with a bevy of motions to dismiss. In two of the motions, Chicago Pacific, the Company, and Foresight argue that Counts I–IV fail to state claims on which relief could be granted.

## II.    LEGAL ANALYSIS

In Counts I–IV of the complaint, Hudson asserts claims for breach of the LLC Agreement. The Company, Chicago Pacific, and Foresight have moved to dismiss those counts under Rule 12(b)(6) as failing to state claims on which relief can be granted.

When considering a motion under Rule 12(b)(6), the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiff. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The court need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg.*, 27 A.3d at 537. This standard "is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'" *Id.* at 537 n.13. Under the Delaware standard, dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any

reasonably conceivable set of circumstances." *Id.* at 535.

## A. Governing Principles Of Contract Law

All of the claims addressed in this decision turn on principles of contract law. Delaware law governs the parties' claims under the LLC Agreement's choice of law provision. Ex. 1 § 13.9.

"The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). A court also can vindicate a breach of contract through an award of nominal damages.[2]

For purposes of a breach of contract claim, the principal issue at the pleading stage is the existence of a contractual violation. *Garfield v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022). Put simply, "[a] breach of contract gives rise to a right of action." 23 *Williston on*

---

[2] Restatement (Second) of Contracts § 346(2) (Am. L. Inst. 1981), Westlaw (database updated Oct. 2022) ("If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages."); *id.* cmt. b ("Although a breach of contract by a party against whom it is enforceable always gives rise to a claim for damages, there are instances in which the breach causes no loss. . . . In all these instances the injured party will nevertheless get judgment for nominal damages."); *see Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009) ("Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages.").

*Contracts* § 63:8 (4th ed.), Westlaw (database updated May 2022). That is because any "unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury." 24 *Williston*, *supra*, § 64:9; *see Norman v. Elkin*, 860 F.3d 111, 128–29 (3d Cir. 2017).

When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotations omitted). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). A contract is unambiguous "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation . . . ." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196.

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). The Delaware Supreme Court has also instructed that "the basic business relationship between parties must be understood to give sensible life to any contract." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*

21

*LLC*, 166 A.3d 912, 927 (Del. 2017). A reasonable reading therefore must be "situated in the commercial context between the parties." *Id.* at 926–27. But this principle cannot be used to override the plain language of the agreement: "While [Delaware courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge*, 166 A.3d at 926–27). "[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not." *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

## B.     The Claims Against Foresight And Chicago Pacific

As a threshold matter, Foresight's motion to dismiss Counts I–III is granted because those counts assert claims for breach of the LLC Agreement and Foresight was not a party to the LLC Agreement. Chicago Pacific's motion to dismiss Counts I–IV is also granted, because although Chicago Pacific was a party to the LLC Agreement in its capacity as a member, it did not owe any of the obligations that the Company seeks to enforce.

A plaintiff only can assert a breach of contract claim against a party that owed the pertinent obligation under the agreement.[3] That principle applies to agreements governing

---

[3] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) ("It is a general principle of contract law that only a party to a contract may be sued for

alternative entities, and this court has dismissed claims for breach on that basis.[4]

Foresight was never a party to the LLC Agreement. Foresight was not a party to the LLC Agreement before the merger, when it was known as Foresight. At that point, Foresight was an unrelated third party whose principals were negotiating with Chicago Pacific and the Company.

Foresight was a party to the merger agreement, but Foresight did not become a party to the LLC Agreement. Foresight's principal role in the merger was to supply the merger consideration. *See* Dkt. 137 Ex. E (cited as "MA") § 2.01.

Both before and after the merger, Foresight was the parent entity of MergerCo. That entity never became a party to the LLC Agreement either. MergerCo merged with the Company and emerged as the surviving entity. Through that transaction, the separate entity existence of the Company terminated, as did the LLC Agreement.

Hudson tries to argue that Foresight can be liable under the LLC Agreement as the

---

breach of that contract."); *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *53 (Del. Ch. May 19, 2020) (same); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014) (same).

[4] *See In re Kinder Morgan, Inc. Corp. Reorg. Litig.*, 2015 WL 4975270, at *5 (Del. Ch. Aug. 20, 2015) (dismissing a claim against non-parties to a limited partnership agreement who "did not owe the contractual obligations that the Complaint [sought] to enforce"); *Allen*, 113 A.3d at 178 (same); *see also CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *13 (Del. Ch. June 23, 2015) (holding that members who were parties to an LLC agreement and thus bound by it could not be sued for breach of obligations that plainly did not apply to them); *id.* at *13 & nn.72–73 (dismissing a claim for beach of an LLC agreement against a party that indirectly owned member interests in the LLC and thus was not a party to the LLC agreement).

legal successor of the Company. But for purposes of claims under the LLC Agreement, Foresight does not have that status. Hudson is correct that when an LLC merges with and into another entity, "all debts, liabilities and duties" of the LLC "attach to the surviving [entity] and may be enforced against it . . . ." 6 *Del. C.* § 18-209(g). But the surviving entity is MergerCo, not Foresight. Thus, if the Company breached an obligation that it owed under the LLC Agreement either before the merger took place or at the effective time, then that obligation continues to run against MergerCo. The obligation does not run to Foresight. The claims for breach of contract against Foresight are dismissed.

Chicago Pacific was a party to the LLC Agreement in its capacity as a member of the Company. 6 *Del. C.* § 18-301; Ex. 1 at 1. But Chicago Pacific does not owe any of the contractual obligations that Hudson seeks to enforce. Each of the provisions that Hudson invokes imposes an obligation on the Company. There are provisions in the LLC Agreement that impose obligations on members, but Hudson does not claim that Chicago Pacific breached any of them. The claims for breach of contract against Chicago Pacific are also dismissed.

The Company is the proper defendant for Hudson's claims for breach of the LLC Agreement. The Company necessarily was a party to the LLC Agreement, because by statute a Delaware LLC is always a party to its own LLC agreement. 6 *Del. C.* § 18-101(9). The LLC Agreement also specified that to be the case. Ex. 1 at 1. It was the Company that owed the obligations that Hudson claims were breached.

## C.     Claims Based On The Composition Of The New Board

Hudson asserts three claims for breach of the LLC Agreement based on the

24

composition of the New Board. One states a claim on which relief can be granted.

### 1. The Loss Of The Right To Designate The Hudson Managers

In its first claim based on the composition of the New Board, Hudson contends that the Company breached the LLC Agreement by eliminating Hudson's right to designate two members of the Board. AC ¶ 103. That theory fails to state a viable claim.

Hudson relies on Section 5.2(a)(iii) of the LLC Agreement, which states: "The Class D Members shall in their sole discretion be entitled to designate two (2) Managers." Ex. 1 § 5.2(a)(iii) (the "Class D Designation Right"). Hudson does not have a right to designate two members of the New Board. Hudson claims that the merger therefore violated the Class D Designation Right.

By statute, parties can use a merger to convert the member interests in a constituent LLC into a different form of property interest. 6 *Del. C.* § 18-209(b). Once that occurs, a party no longer has the ability to exercise the rights associated with the member interests it previously held. *See Fed. United Corp. v. Havender*, 11 A.2d 331, 334–35 (Del. 1940); *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989) (Allen, C.).

Hudson cannot claim a breach of the Class D Designation Right because when the merger became effective, the Class D units were converted into the right to receive a mixture of cash and stock in Foresight. The conversion of Hudson's Class D units into different consideration did not violate the Class D Designation Right; it was a distinct outcome contemplated by the Delaware Limited Liability Company Act (the "LLC Act"). Once the conversion took place, Hudson had no ability to assert a claim for breach of the

Class D Designation Right. After the merger closed, the LLC Agreement that contained the Class D Designation Right no longer existed and could not support a claim of breach. *See Warner*, 583 A.2d at 970.

If Hudson wanted to be able to assert a claim for breach of the Class D Designation Right based on a merger in which the Company did not survive and the governing documents of the successor entity did not provide for the Class D Designation Right, then Hudson needed to obtain that right explicitly. *See Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854–55 (Del. 1998). The Class D Designation Right did not provide for that outcome. Hudson's claim for breach of the Class D Designation Right fails to state a claim on which relief can be granted.

## 2. The Decreased Size Of The New Board

In a second claim based on the composition of the New Board, Hudson argues that the merger violated the LLC Agreement by causing the size of the Board to change. *See* AC ¶¶ 98, 103–05. That theory also fails to state a claim on which relief can be granted.

As the source of its claim for breach, Hudson relies on language in the LLC Agreement that provides as follows:

> Notwithstanding anything contained herein to the contrary, . . . without the approval of the holders of a majority of the then issued and outstanding Class D Units, the Company will not, and will not permit any Subsidiary to . . .
>
> (b) increase or decrease the size of the Board; . . . [or]
>
> (i) enter into any agreement to do any of the foregoing.

Ex. 1 § 6.9(b), (i) (the "Board Size Consent Provision"). Hudson claims that the merger breached the Board Size Consent Provision because before the merger, the Board had

26

eleven members. After the merger, the New Board has nine members. As the holder of 100% of the Class D units, Hudson did not consent to that change. Hudson concludes that the change from eleven members to nine members violated the Board Size Consent Provision.

Hudson's argument fails because Hudson is focusing on the wrong board. The Board Size Consent Provision gives Hudson a consent right when "the Company" changes the size of "the Board." Under the LLC Agreement, "the Board" is defined as "the Board of Managers of the Company established pursuant to Section 5.2." *Id.* at 2. The Board Size Consent Provision thus plainly focuses on the Company Board. Hudson cannot establish a breach of the Board Size Consent Provision by focusing on the New Board.

Hudson's argument also fails because no one changed the size of the Board. As a result of the merger, the Company ceased to exist as a separate entity. When that happened, the Company Board ceased to exist. No one increased or decreased its size. It vanished.

In substance, Hudson is arguing that the Board Size Consent Provision conferred a consent right over any merger that causes the Company's separate existence to cease because that event decreases the size of the Board to zero by eliminating it. That theory is not viable. Delaware decisions have made clear that if a party wants a consent right that applies to mergers generally, or which applies to mergers that have the effect of altering, amending, or eliminating a special right that the party possesses, then the consent right

27

must refer specifically to a merger. *See Avatex*, 715 A.2d at 854–55. If the special right does not refer specifically to a merger, then the right does not encompass a merger. *Id.*

In this case, the merger both converted the Class D units into the right to receive a combination of cash and shares in Foresight and eliminated the Company's separate existence. If Hudson wanted the Board Size Consent Provision to encompass those effects, then Hudson needed to bargain for specific language referring to a merger. Hudson did not do that, and it cannot retroactively turn the Board Size Consent Provision into a right to consent to a merger. The claim for breach of the Board Size Consent Provision does not state a claim on which relief can be granted.

### 3. The Seats For The Chicago Pacific Representatives

In its third claim based on the makeup of the New Board, Hudson argues that the merger required Hudson's consent because the transaction resulted in three principals of Chicago Pacific receiving seats on the New Board. *See* AC ¶¶ 8, 103. Hudson argues that because the Chicago Pacific representatives received those seats and became entitled to compensation for serving as members of the New Board, the Company breached a provision in the LLC Agreement that requires Hudson's consent before the Company can proceed with a transaction or series of transactions with Chicago Pacific or its affiliates. Although this claim appears weak, it survives pleading-stage review.

When asserting this claim of breach, Hudson relies on the following provision in the LLC Agreement:

> Notwithstanding anything contained herein to the contrary, for so long as the Class D Units remain issued and outstanding, without the approval of

the holders of a majority of the then issued and outstanding Class D Units, the Company will not, and will not permit any Subsidiary to . . .

(c) enter into any transaction or series of related transactions (including a Sale of the Company) with any [Chicago Pacific] Member or any Affiliate of any [Chicago Pacific] Member, including without limitation compensation or equity arrangements with any members of the Board or principals, employees or operating partners of any [Chicago Pacific] Member or any Affiliate of a [Chicago Pacific] Member . . . [or]

(i) enter into any agreement to do any of the foregoing.

Ex. 1 § 6.9(c), (i) (the "Affiliated Transaction Consent Provision"). Hudson alleges that three "principals of . . . [Chicago Pacific]" received seats on the New Board and will receive compensation in that capacity. AC ¶ 101. Hudson maintains that it had the right to consent to those compensation arrangements. Because Hudson did not give its consent, Hudson asserts that the merger violated the Affiliated Transaction Consent Provision.

The Company has a simple response: The Chicago Pacific representatives accepted directorships and the associated compensation from Foresight, not from the Company, and that they did so after the merger closed. At that point, the Company's existence had terminated, and the Class D units had been converted into the right to receive a mix of cash and Foresight stock. The Affiliated Transaction Consent Provision no longer existed, and there was no one who could enforce it. The Company concludes that just as Hudson cannot assert a claim for breach of the Class D Designation Right or the Board Size Consent Provision, Hudson cannot assert a claim for breach of the Affiliated Transaction Consent Provision.

The pleading-stage flaw in this argument is that the Affiliated Transaction Consent Provision applies not only to the transaction itself, but also to a "series of transactions"

29

that have the same effect. It also applies to the Company "entering into any agreement" regarding a transaction or series of transactions that would violate the Affiliated Transaction Consent Provision. Given that broad language, it is reasonably conceivable that a transaction or series of transactions in which principals of Chicago Pacific ultimately receive compensation arrangements could require Hudson's consent.

The claim for breach becomes easier to perceive in a more stark hypothetical. Imagine a similar transaction structure where Chicago Pacific representatives receive ten-figure transaction bonuses from the surviving entity. Such a scenario would support an inference that Chicago Pacific had used the transaction to extract non-ratable benefits for its principals, which is precisely the type of transaction that the Affiliated Transaction Consent Provision allows Hudson to prevent. The fact that the substantial bonuses came after the deal closed and from the surviving entity would not give Chicago Pacific a free pass. Although it is admittedly less plausible that Chicago Pacific used board seats for that purpose, the contractual analysis is the same.

The next question is whether the structuring of the transaction as a forward merger in which the Class D units were converted into the right to receive cash and stock of Foresight enabled the Company to avoid the claim of breach. If no aspect of the contractually prohibited conduct took place until after the merger closed, then it might be possible to hold that the arrangements did not violate the Affiliated Transaction Consent Provision. At that point, the Affiliated Transaction Consent Provision no longer existed, and there were no holders of Class D units to enforce it. The analysis would track the

30

reasoning applicable to the Class D Designation Right and the Board Size Consent Provision.

The extension of the Affiliated Transaction Consent Provision to any "series of transactions" and "any agreement to do any of the foregoing" changes matters and makes it impossible to dismiss this claim at the pleading stage. It is reasonably conceivable that when the Company and Foresight entered into the merger agreement, they reached an "agreement to do any of the foregoing," namely to accomplish a series of transactions culminating in the Chicago Pacific representatives receiving benefits. It is reasonably conceivable that the resulting breach took place when the merger agreement was executed, *before* the merger converted the Class D units into the right to receive cash and stock of Foresight and *before* the merger resulted in the cancellation of the separate existence of the Company. The merger could not have extinguished such a claim; it became an obligation of MergerCo. *See* 6 *Del. C.* § 18-209(g).

Hudson's claim for breach of the LLC Agreement based on the addition of the Chicago Pacific representatives to the New Board survives pleading-stage review.

## D.     The De Facto Agreement To Combine The Company And MyCare

Hudson next argues that the merger violated the Affiliated Transaction Consent Provision because the merger is part of a series of transactions designed to achieve a combination between the Company and MyCare. This theory states a claim on which relief can be granted.

In advancing this theory, Hudson again relies on the Affiliated Transaction Consent Provision, which requires Hudson's consent before the Company "enter[s] into

31

any transaction or series of related transactions (including a Sale of the Company) with any [Chicago Pacific] Member or any Affiliate of any [Chicago Pacific] Member" or enters into "any agreement to do any of the foregoing." Ex. 1 § 6.9. MyCare is an affiliate of Chicago Pacific, so a series of related transactions that resulted in a combination of the Company and MyCare would require Hudson's consent. So would the existence of an agreement to accomplish a series of related transactions that resulted in a combination of the Company and MyCare. Hudson has not given its consent, so either scenario would result in a breach of the LLC Agreement.

To date, the Company has not engaged in a transaction with MyCare, nor has it entered into a formal agreement to pursue a transaction with MyCare. Hudson argues that it is reasonable to infer that Chicago Pacific and Foresight have an unwritten agreement to combine the Company with MyCare and that this has been their plan all along.

In support of this theory, Hudson points out that the Original Deal Structure involved a three-way merger combining the Company, MyCare, and Foresight. Hudson alleges that although the Company, Chicago Pacific, and Foresight abandoned the Original Deal Structure after Hudson withheld its consent, they remained committed to combining the Company with MyCare. As support, Hudson points out that Chicago Pacific continued working on that concept for another month after Hudson withheld its consent in January 2021. *See* PXs 25, 34. As late as the end of February, Tolan met with representatives of Foresight to discuss a transaction involving MyCare, including how to finance a potential transaction. *See* PX 41.

Hudson also argues that Chicago Pacific has shown persistent hostility to Hudson's rights under the LLC Agreement. Hudson argues that it is reasonably conceivable that Chicago Pacific and Foresight have agreed to pursue a combination of the Company with MyCare, but recognized that they needed to split the Original Deal Structure into two steps so that they could use a first-step merger to eliminate Hudson's ability to block a combination with MyCare.

Hudson also cites Chicago Pacific's counterintuitive devotion to a transaction with Foresight, even when Foresight took aggressive positions in the negotiations and demanded onerous terms. Chicago Pacific remained focused on Foresight even though JPMorgan advised Chicago Pacific and the Company to negotiate with other sponsors to create competition. Chicago Pacific later remained committed to a transaction with Foresight despite Foresight reducing the value of the post-transaction entity by one-third, despite the size of the PIPE plummeting, and despite Foresight experiencing massive redemption requests. Hudson alleges that the only rational reason for the Company to have pressed forward with the merger was because Foresight had agreed to a follow-on deal involving MyCare.

At the pleading stage, this constellation of facts makes it reasonably conceivable that a de facto agreement existed to combine the Company and MyCare, with the de-SPAC merger as the first step towards that goal. It is also reasonably conceivable that the agreement arose before the merger took place. Consequently, as with Hudson's claim for breach of the Affiliated Transaction Consent Provision based on the composition of the New Board, the claim for breach of the same provision based on an agreement to

33

combine the Company and MyCare arose before the merger and runs against MergerCo as the surviving entity. The claim accordingly survives dismissal.

**E.     The Failure To Make A First-Priority Distribution In Cash**

Hudson next argues that the Company breached the LLC Agreement by failing to provide Hudson with $50 million in cash as a first-priority distribution. That framing of the claim combines two theories in one. The first theory maintains that Hudson was entitled to a first-priority distribution of $50 million *in cash* and that the Company breached that obligation by not paying Hudson in cash. The second theory asserts that Hudson was entitled to a priority distribution of $50 million and that the Company failed to provide Hudson with a package of consideration having that value because the Company overvalued the securities of Foresight.

As the source of its right to a first-priority distribution, Hudson relies on Section 4.1(b) of the LLC Agreement, which states:

> [T]he Board may (but shall not be obligated to) cause the Company to make Distributions at any time or from time to time, but each such Distribution shall be made as follows:
>
> (i) *First*, to the Members holding Class D Units in proportion to their Class D Unreturned Contribution Amount until each such Member's Class D Unreturned Contribution Amount has been reduced to zero dollars ($0);
>
> (ii) *Second*, to the Members holding Class A Units in proportion to their Class A Unreturned Contribution Amounts until each such Member's Class A Unreturned Contribution Amount has been reduced to zero dollars ($0);
>
> (iii) *Third*, to the Members holding Class A Units and Class D Units in proportion to their respective Class A Unpaid Preferred Return Balances and Class D Unpaid Preferred Return Balances until each Class A Unpaid Preferred Return Balance and each Class D Unpaid Preferred Return Balance has been reduced to zero dollars ($0);

(iv) *Thereafter*, subject to Sections 4.1(d) and 4.1(e) below, any remaining amounts to the Members holding Vested Units, in proportion to their respective number of Vested Units.

Ex. 1 § 4.1(b) (the "Distribution Waterfall"). The LLC Agreement defines a "Distribution" as "each distribution made by the Company to a Member, whether in cash, property or securities of the Company . . . provided that none of the following shall be a Distribution: . . . (ii) any recapitalization, exchange *or* conversion of securities of the Company." *Id.* at 6 (emphasis added).

Standing alone, the Distribution Waterfall only applies to distributions. It does not plainly apply to the allocation of merger consideration. In fact, the definition of "Distribution" states that a "conversion of securities of the Company" is not a distribution. In the merger, each Class D unit was converted into the right to receive a combination of cash and shares in Foresight. If the analysis stopped with the plain language of the Distribution Waterfall and the definition of a Distribution, then the allocation of the merger consideration did not constitute a distribution.

But the analysis does not stop there. Under Section 4.1(c) of the LLC Agreement, the Distribution Waterfall applies to a merger that qualifies as a Sale of the Company. That section provides as follows:

> In the event of a Sale of the Company, each Member shall receive in exchange for the Units held by such Member the same portion of the aggregate consideration from such transaction that such member would have received if such aggregate consideration had been distributed by the Company in accordance with the provisions of Section 4.1(b) (and with it being understood that determinations regarding the timing and amount of Distributions in connection with a Sale of the Company shall be made by the Board).

35

*Id.* § 4.1(c) (the "Sale Allocation Provision"). Thus, if a transaction qualifies as a Sale of the Company, then the Distribution Waterfall governs the allocation of the merger consideration.

> The LLC Agreement defines a "Sale of the Company" as either
>
> (i) the sale, lease, license, transfer, conveyance or other disposition, in one transaction or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole or
>
> (ii) a transaction or a series of related transactions (including by way of merger, consolidation, recapitalization, reorganization or sale of securities by the holders of securities of the Company) the result of which is that
>
> > (A) the holders of the Company's outstanding voting securities or their Affiliates immediately prior to such transaction or series of related transactions are (after giving effect to such transaction or series of related transactions) no longer, in the aggregate, the "beneficial owners" . . . directly or indirectly through one or more intermediaries, of more than 50% of the voting power of the outstanding voting securities of the Company, and
> >
> > (B) the Class A Members are no longer entitled to appoint at least three managers to the Board.

*Id.* at 10.

Under the plain language of subpart (ii), the merger qualifies as a Sale of the Company. The merger meets requirement of subpart (ii)(A) because there are no longer any holders of the Company's outstanding voting securities, much less holders of more than 50% of the voting power that those securities carry. The Company's pre-merger members emerged from the merger owning approximately 75% of the equity of Foresight, but Foresight is not the same entity as the Company. The merger extinguished the separate existence of the Company, so it is not possible for the Company's members to continue to own a majority of the voting power of its securities. Subpart (ii)(A)

36

necessarily envisions a merger in which the Company is the *surviving* entity, not a transaction in which the Company's existence ceases.

The same is true for subpart (ii)(B). The Class A Members are no longer entitled to appoint at least three managers to the Board because, after the merger, the Class A Members no longer exist, and the Board does not exist either. The fact that Chicago Pacific can appoint three members of the New Board does not satisfy the requirements of subpart (ii)(B), because Chicago Pacific no longer holds Class A units, and the New Board is not the Board.

Because the merger qualified as a Sale of the Company, the Sale Allocation Provision requires that the merger consideration be allocated in accordance with the Distribution Waterfall. Confirming that conclusion, the merger agreement itself contemplates that the Distribution Waterfall governs the allocation of merger consideration. The operative language states: "[T]he allocation of the Company Closing Consideration among the Company Unitholders shall be determined based upon a hypothetical distribution of the Company Closing Condition after the Blocker Reorganization and immediately prior to the P3 Effective Time by the Company." MA § 2.3(a).

The plain language of both the Sale Allocation Provision and the merger agreement thus provides for the Distribution Waterfall to govern the allocation of the merger consideration. The question then becomes whether it is reasonably conceivable that the Distribution Waterfall entitled Hudson to receive a distribution of $50 million in cash before any other member received any merger consideration. Hudson alleges that

instead of providing Hudson with $50 million in cash as a first-priority distribution, the Company allocated the merger consideration pro rata, resulting in Hudson having the right to receive approximately $3.5 million in cash plus shares of Foresight stock, while other members had the right to receive $14.8 million in cash plus shares of Foresight stock. Dkt. 147 at 10, 18. Hudson maintains that it should have received all of the cash.

It is undisputed that Hudson contributed $50 million in cash in return for its Class D units and that none of that amount had been returned to Hudson when the merger took place. Under the plain language of the Distribution Waterfall, Hudson was entitled to receive distributions "until each such Member's Class D Unreturned Contribution Amount has been reduced to zero dollars ($0)." Ex. 1 § 4.1(b). Hudson thus has a right to a first-priority distribution of $50 million in value.

Having a right to a first-priority distribution is different than having a right to receive a first-priority distribution in cash. The Distribution Waterfall does not require that the Company make a distribution in cash. It contemplates that Hudson will receive the first $50 million in value that the Company distributes, whether in cash or property. *See* Dkt. 165 at 81. The LLC Agreement does not require that a distribution be made in cash. As noted, it defines a "Distribution" as "each distribution made by the Company to a Member, whether in cash, property or securities." Ex. 1 at 6.

Hudson made a capital contribution to the Company in the amount of $50 million in cash. AC ¶¶ 19, 114. Once Hudson made its contribution, that amount was credited to its capital account. Ex. 1 § 3.2. Once contributed, Hudson had no right to withdraw any amounts from its capital account. *Id.* § 3.4. Hudson also had no right to seek partition or

38

to demand any particular assets of the Company. *Id.* § 6.3. Nor did the Company have any obligation to make distributions in cash or to convert assets to cash to make distributions. Instead, the Company could make distributions in kind. *Id.* § 3.6. The LLC Agreement expressly provides that if the Company makes a distribution in kind, then "the Company shall be treated as making a distribution equal to the Fair Market Value of such property for purposes of the [Distribution Waterfall]." *Id.*

These provisions acknowledge the reality that distributions do not need to be paid in cash. They can take the form of property distributed in kind. In one memorable example during World War II, a company made a distribution in the form of warehouse receipts for whiskey. *See* Bayless Manning & James J. Hanks, Jr., *Legal Capital* 38 (3d ed. 1990); *see also* Donald Kehl, *Corporate Dividends* 170–74 (1941) (providing examples of non-cash distributions).

Hudson's right to a priority distribution ensures that when the Company distributes property of any type, Hudson receives a first-priority distribution until it has received property with a value of $50 million. The form of cash or property does not matter.

In this case, the merger consideration took the form of a mix of cash and stock. The Company was obligated to allocate that consideration to Hudson until Hudson had received $50 million in value. Hudson did not have the right to receive a payment in cash. Hudson's contention that it was entitled to receive $50 million in cash from the Company fails to state a claim on which relief can be granted.

But that is not the end of Hudson's claim. Hudson argues that the Company improperly valued the shares of Foresight stock at $10 per share, when those shares were worth materially less. Hudson contends that because of that decision, Hudson did not receive its full priority distribution of $50 million.

It is reasonably conceivable that Hudson has stated a claim for breach of the Distribution Waterfall under the latter theory. Under Section 3.6 of the LLC Agreement, the Company was obligated to value the shares at fair market value, and Hudson observes that on December 1, 2021, just two days before the merger closed, shares of Foresight common stock closed at $8.87 per share. Scholars likewise have explained persuasively that the value of SPAC equity when a de-SPAC merger takes place is materially less than $10 per share.[5] The Company's use of $10 per share supports a reasonable inference that

---

[5] Michael Klausner, Michael Ohlrogge, & Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. Reg. 228, 232 (2022) (listing various costs that a SPAC bears and observing that "[a]s a result of these costs, by the time the SPAC merges with a target company, it has far less net cash per share than the $10.00 attributed to them in the SPAC's merger. We find that the median SPAC delivers only $5.70 per share in net cash in its merger."); *id.* at 246 ("[W]e find that the mean and median SPACs in our Cohort have just $4.10 and $5.70 respectively, in net cash per share outstanding at the time of their merger. Nonetheless, when a SPAC merges, it values its shares at $10.00. The difference between the purported $10.00 share value and the amount of net cash underlying each share is the amount that has been extracted in compensation paid to the sponsor, the IPO-stage investors, and the underwriter to set up the SPAC as a public company, and in fees paid to others in connection with the merger."); *id.*at 253 ("The dilution and dissipation of cash embedded in the SPAC structure reduce the value of SPAC shares. In a merger between a SPAC and a target, the parties ascribe a value of $10.00 to SPAC shares. That is roughly the redemption price of a SPAC share, and therefore the price at which it trades prior to a merger. But the SPAC does not deliver $10.00 of cash to the target. Far from it. It delivers $10.00 minus the costs we describe above. So, the median SPAC delivers $5.70 in net cash for each pre-merger share—more for high-quality SPACs and

the Company did not satisfy the full amount of Hudson's priority distribution. Hudson's claim for breach of the Distribution Waterfall therefore states a claim on which relief can be granted, but only as to whether Hudson received the full amount of its priority distribution.

## F.     The Blocker Transactions

Hudson next focuses on the Blocker Transactions, which were part of the Up-C transaction structure that Chicago Pacific and Foresight used in the merger. The purpose of the Blocker Transactions was to enable Chicago Pacific to obtain favorable tax treatment for part of its share of the merger consideration. Hudson contends that the inclusion of the Blocker Transactions breached four different provisions in the LLC Agreement. Three of these theories state claims on which relief can be granted.

### 1.     The Affiliated Transaction Consent Provision

Hudson first relies on the Affiliated Transaction Consent Provision. Recall that this provision requires Hudson's consent before the Company "enter[s] into any

---

less for non-high-quality SPACs."). *See generally* Michael Klausner, Michael Ohlrogge, & Harald Halbhuber, *Net Cash Per Share: The Key to Disclosing SPAC Dilution*, 40 Yale J. Reg. Bull. 18 (2022). The issue is more complex than it might seem, because the negotiation of the exchange ratio for the de-SPAC merger may result in the target company stockholders receiving fair value while the non-redeeming SPAC stockholders bear the cost of the overvalued SPAC shares. *See* Klaunsner, Ohlrogge & Ruan, *supra*, at 300–03; Holger Spamann & Hao Guo, *The SPAC Trap: How SPACs Disable Indirect Investor Protection*, 40 Yale J. Reg. Bull. 75, 83 (2022). For present purposes, it is reasonable to infer that the fair market value of Foresight's equity was not $10 per share and that the Company breached the Distribution Waterfall by using that valuation when making Hudson's first-priority distribution.

transaction or series of related transactions (including a Sale of the Company) with any [Chicago Pacific] Member or any Affiliate of any [Chicago Pacific] Member" or enters into "any agreement to do any of the foregoing." Ex. 1 § 6.9. At the pleading stage, Hudson has stated a viable claim.

The Blocker Entities were affiliates of Chicago Pacific, so an agreement to pursue a series of related transactions that resulted in a combination of the Company and the Blocker Entities would require Hudson's consent. Hudson has not given its consent, so either scenario would result in a breach of the LLC Agreement.

Viewed in isolation, the Blocker Transactions did not involve any steps that would bring them within the scope of the Affiliated Transaction Consent Provision. And that was by design. The transactional lawyers for the Company and Foresight intentionally structured the Blocker Transactions so that there would not be any direct transaction between one of the Blocker Entities and the Company. Rather, to effectuate the Blocker Transactions, an affiliate of Chicago Pacific known as CPF P3 Splitter, LLC ("Splitter") distributed its Class A units to the Blocker Entities. PX 136 at '557. Next, the Blocker Entities merged with two Foresight merger subsidiaries. *Id.* at '560; Dkt. 137 Ex. F § 1.01(b). Finally, the surviving entities merged with and into Foresight. PX 136 at '561; Dkt. 137 Ex. F § 1.01(b).

But that does not mean that the Blocker Transactions were separate from the merger as a factual matter. Hudson argues that the Blocker Transactions were a necessary part of the Up-C transaction structure that the merger contemplated and should be considered part of a series of transactions that were covered by the merger agreement.

42

*See* AC ¶¶ 50–66. For pleading-stage purposes, there is ample support for Hudson's position.

- The merger agreement specifically referenced the agreement governing the Blocker Transactions and described them as part of the overall transaction. *See* MA § 1.01(c).

- The merger was sandwiched in between the multiple steps of the Blocker Transactions, with the merger agreement providing specifically that certain aspects of the Blocker Transactions would take place before the merger and other aspects would take place after the merger, but with everything to happen on the same day. *Id.* §§ 1.01(d), (g)–(h), 1.02.

- The merger agreement also reduced the amount of the cash consideration available for the members of the Company by the amount of cash necessary to fund the payments to the Blocker Entities. *See id.* §§ 1.07(a)–(b).

- Numerous provisions throughout the merger agreement link the Blocker Transactions to the merger and treat them as a single overarching transaction. *See, e.g.*, *id.* §§ 4.10, 5.02(a), 6.01(a), 7.01(d), 7.02(j).

This court has recognized that similar blocker transactions that were part of an Up-C merger violated a comparable affiliated transaction consent provision. *See Williams Field Servs. Gp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350, at *29 (Del. Ch. Sept. 25, 2019), *aff'd*, 237 A.3d 817 (Del. 2020). That decision was rendered after trial, with the benefit of a full record. That decision nevertheless shows that blocker transactions can be viewed as part of a singular, overarching transaction or series of transactions for purposes of a consent right.

This case is at the pleading stage. The defendants have good arguments as to why the Affiliated Transaction Consent Provision does not apply to the Blocker Transactions, but the court cannot resolve the issue as a matter of law based on the current record. This claim survives pleading-stage review.

### 2.     The Affiliated Transaction Prohibition

Hudson next relies on Section 5.1(c) of the LLC Agreement, which prohibits the Company from engaging in certain transactions with Chicago Pacific or its affiliates (the "Affiliated Transaction Prohibition"). This theory also states a claim on which relief can be granted.

The Affiliated Transaction Prohibition states:

> [T]he Company shall not be permitted to enter into any transaction or series of related transactions (including a Sale of the Company)
>
> > [1] having an aggregate value in excess of $100,000
> >
> > [2] with any [Chicago Pacific] Member or Affiliate of any [Chicago Pacific] Member
> >
> > [3] that is not on arm's length terms as determined in good faith by the Company
> >
> > [4] unless such transaction has been approved by the Board, including at least one Co-Founder Designated Manager and one [Hudson] Manager.

Ex. 1 § 5.1(c) (enumeration and formatting added). The Affiliated Transaction Prohibition thus parallels the Affiliated Transaction Consent Provision, but with a slightly different scope.

The analysis of the claim for breach of the Affiliated Transaction Prohibition tracks the analysis of the claim for breach of the Affiliated Transaction Consent Provision. Hudson has stated a claim for breach of the Affiliated Transaction Prohibition.

**3.** **The Requirement To Allocate The Aggregate Merger Consideration In Accordance With The Distribution Waterfall**

In its third claim of breach based on the Blocker Transactions, Hudson relies on Section 4.1(c) of the LLC Agreement. As discussed above, that provision states that in a Sale of the Company, members must receive merger consideration that tracks how the consideration would be distributed under the Distribution Waterfall. Hudson asserts that the Blocker Transactions violated this provision by enabling Chicago Pacific to receive consideration in the form of tax benefits that it would not have received under the Distribution Waterfall. Dkt. 147 at 22–23 n.25; AC ¶ 100.

This decision has already discussed the Sale Allocation Provision and its requirement that in a Sale of the Company, each member "shall receive in exchange for the Units held by such Member the same portion of the aggregate consideration from such transaction that such member would have received if such aggregate consideration had been distributed by the Company in accordance with the [Distribution Waterfall]." Ex. 1 § 4.1(c). This decision also has explained that the merger qualifies as a Sale of the Company.

The operative question, therefore, is whether the fact that Chicago Pacific received a portion of the merger consideration separately, through the Blocker Transactions, constitutes a reasonably conceivable breach of the Sale Allocation Provision and the Distribution Waterfall. Recall that under the Sale Allocation Provision, "each Member shall receive in exchange for the Units held by such Member the same portion of the aggregate consideration from such transaction that such member would have received if

45

such aggregate consideration had been distributed by the Company in accordance with the [Distribution Waterfall]." *Id.* The Sale Allocation Provision thus looks to the "aggregate consideration" from the transaction and requires that each member "shall receive" the portion of the consideration that it would receive under the Distribution Waterfall.

Splitter was an affiliate of Chicago Pacific through which the fund owned Class A units. Splitter was thus a member of the Company. Through the Blocker Transactions, Splitter transferred its Class A units to two other affiliates of Chicago Pacific, which then engaged in transactions that enabled them to receive merger consideration separately, outside of the Distribution Waterfall, through direct transactions with Foresight. Through that structure, Chicago Pacific received tax benefits.

It is reasonably conceivable for purposes of pleading-stage analysis that the use of that structure violated the Sale Allocation Provision. Rather than the "aggregate consideration" passing through the Distribution Waterfall and being shared by all members, Chicago Pacific created a bypass for Splitter. At a later stage of the case, it may prove that the bypass was acceptable. At the pleading stage, it is reasonably conceivable that Hudson has stated a claim for breach of the Sale Allocation Provision.

4.    **Section 9.3(b) And The Condition Requiring That Members Receive The Same Form Of Consideration**

In its final claim of breach based on the Blocker Transactions, Hudson invokes Section 9.3(b) of the LLC Agreement. Hudson maintains that this provision gave Hudson the right "to receive the same form of consideration as other members." AC ¶ 104.

Hudson asserts that the Blocker Transactions violated this provision by enabling Chicago Pacific to receive tax benefits that no other member received. Dkt. 147 at 22–23 n.25; AC ¶ 100.

Section 9.3(b) applies to an Approved Sale, defined in common-sense fashion as a Sale of the Company that the Board has approved. In substance, that section gives the Board the right to force members to accept a third-party sale as long as certain conditions are met, including a condition that "upon the consummation of the Approved Sale, each Member will receive the same form of consideration for their Units as is received by the other members . . . ." Ex. 1 § 9.3(b). If the conditions are not met, then the Board cannot force the Company's members to go along with the sale.

The Company did not rely on Section 9.3(b) to effectuate the merger. If it had, then it would have been reasonably conceivable that because Chicago Pacific received tax-deferred consideration while other investors did not, the same-consideration condition was not met. *See Williams Field Servs.*, 2019 WL 4668350, at *22 (holding that an Up-C structure did not satisfy a condition under which investors had to receive the same consideration). That would have meant that the Company could not invoke the forced sale right. If the Company nevertheless tried to engage in a forced sale, then Hudson would have had a claim for breach.

Because the Company did not seek to force through an Approved Sale, Section 9.3(b) is not in play. Hudson's reliance on this provision does not support a claim for breach.[6]

## G. The Failure To Honor The Preemptive Option

Hudson's next set of claims relies on the Preemptive Option. That provision gives Hudson a preemptive right to protect its investment in the Company against dilution by investing up to $25 million to acquire additional Class D units at Hudson's original purchase price. Hudson alleges that the Company breached the LLC Agreement by refusing to allow Hudson to exercise the Preemptive Option. Hudson advances two versions of this claim. In the first version, Hudson contends that the merger triggers the

---

[6] The complaint contains an elliptical reference to the merger violating "Hudson's rights under the LLC Agreement to only consent to an amended LLC agreement that preserves all of Hudson's rights under the existing agreement." AC ¶ 105. It is far from clear what Hudson is talking about, but there is language in Section 9.9(b) of the LLC Agreement which contemplates that if the Company engages in a Corporate Conversion, *i.e.*, a conversion of the Company into a corporation in connection with a Public Offering, then members must have "the same economic, voting and corporate governance provisions contained herein after taking into consideration the structure of the Company and its Subsidiaries and their respective securities." Ex. 1 § 9.9(b). Hudson cannot claim a breach of Section 9.9(b) because the Company did not effectuate a Corporate Conversion. There might have been a reasonably conceivable argument based on the strong functional similarity between the de-SPAC merger and a Corporate Conversion that the implied covenant imposed an obligation on the Company to ensure that the post-merger governing documents of Foresight (or conceivably MergerCo) preserved the Preemptive Option so that Hudson could exercise it if a triggering event subsequently occurred. Note that under this reading, the de-SPAC merger is not itself a triggering event; the Preemptive Option is simply preserved for potential exercise in the future. The governing documents of MergerCo and Foresight did not preserve the Preemptive Option, giving rise to breach under this theory. Hudson did not make that argument, and it is too late now. *See* Ch. Ct. R. 15(aaa).

48

plain language of the Preemptive Option. AC ¶ 110. In the alternative version, Hudson contends that the Company should be required to honor the Preemptive Option under the implied covenant of good faith and fair dealing. *Id.* ¶ 112. Neither theory survives pleading-stage analysis.

### 1. The Plain Language Theory

Hudson contends that the Company breached the plain language of the Preemptive Option by rejecting Hudson's contention that the merger constituted a triggering event for its exercise. This theory fails to state a claim on which relief can be granted.

The Preemptive Option provides as follows:

> Notwithstanding anything contained herein to the contrary, to the extent the Company seeks to raise capital (as determined by and approved by the Board) through the primary method of selling Equity Securities (but excluding the issuance of Equity Securities pursuant to <u>Section 3.1(c)(i)(B)</u> through <u>3.1(c)(i)(F)</u>) (an "***Eligible Capital Raise***") . . . [Hudson] shall have the option to fund the capital sought to be raised in the Eligible Capital Raise, up to an aggregate in all Eligible Capital Raises of $25,000,000.

Ex. 1 § 3.10(a). If Hudson exercises the Preemptive Option, then "the Company shall sell to [Hudson] additional Class D Units at a price per Unit equal to the price paid by [Hudson] on the Effective Date" to acquire its original investment. *Id.*

Did the merger qualify as an Eligible Capital Raise? As set forth in the Preemptive Option, an Eligible Capital Raise is a transaction in which "the Company seeks to raise capital . . . through the primary method of selling Equity Securities." The LLC Agreement elsewhere defines "Equity Securities" as "[u]nits, stock or other equity interests in the Company." *Id.* at 6.

49

It is reasonably conceivable that by engaging in the merger, the Company was seeking to raise capital. Foresight is a SPAC, and a SPAC is simply an entity that has obtained a public listing and raised capital with the goal of acquiring a non-publicly traded entity with an operating business. Through a de-SPAC merger, the target company receives an infusion of capital and access to the public markets through the SPAC's listing. A de-SPAC merger is widely understood to be the functional equivalent of a traditional IPO for the target company, while offering a transactional path that provided ways to bypass regulatory hurdles associated with a traditional IPO.[7]

Under a strict reading of the Preemptive Option, however, the merger was not a triggering event because the Company was not seeking to raise capital through the primary method of selling Equity Securities—meaning its own equity securities. Foresight contributed capital to MergerCo in return for equity interests in MergerCo, with those interests issued just before the effective time. *See* MA § 1.07. In the merger, the Company merged with MergerCo, and the member interests in the Company were converted into the right to receive a combination of cash and stock of Foresight. Viewed

---

[7] *See, e.g.*, Klausner, Ohlrogge, & Ruan, *supra*, at 235 ("In effect, a SPAC merger is an IPO by the company with which it merges."); Neal F. Newman & Lawrence J. Trautman, *Special Purpose Acquisition Companies (SPACs) and the SEC*, 24 U. Pa. J. Bus. L. 639, 642 (2022) ("Special Purpose Acquisition Companies (SPACs) are simply enterprises that raise money from the public with the intention of purchasing an existing business, thereby achieving liquidity and becoming publicly-traded in the securities markets. . . . If the SPAC is successful in raising money and the acquisition takes place, 'the target company takes the SPAC's place on a stock exchange, in a transaction that resembles a public offering.'") (quoting Dave Michaels, *SPAC Warrants Draw SEC Scrutiny*, Wall St. J., Apr. 13, 2021, at B1).

from a technical standpoint, the Company did not sell any of its own Equity Securities; its Equity Securities were converted into the right to receive the merger consideration.

When the language of the Preemptive Option is read formalistically, the merger is not a triggering event. Hudson's claim for breach based on the plain language of the Preemptive Option fails to state a claim on which relief can be granted.

### 2. The Implied Covenant Theory

Hudson asserts in the alternative that if the merger did not trigger the express terms of the Preemptive Option, then the Company breached the implied covenant of good faith and fair dealing that inheres in the LLC Agreement by not facilitating the exercise the Preemptive Option in connection with the merger. *See* AC ¶ 112. Hudson relies on the fact that the de-SPAC merger is the functional equivalent of a traditional IPO, and Hudson would be able to exercise the Preemptive Option in connection with a traditional IPO. Hudson posits that if the parties had thought to negotiate about whether a de-SPAC merger would constitute an "Eligible Capital Raise," they would have agreed that it would trigger the Preemptive Option. This theory fails to state a claim on which relief can be granted.

#### a. The Standard For Evaluating An Implied Covenant Claim

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981), Westlaw (database updated Oct. 2022). The Delaware Supreme Court has summarized this state's approach to the implied covenant as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.

*Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (cleaned up). To prevail on an implied covenant claim, a plaintiff must plead and later prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

When determining whether to apply the implied covenant, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Allen*, 113 A.3d at 183. "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014). The court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009).

52

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled." *Allen*, 113 A.3d at 183. One reason a gap might exist is if the parties negotiated over a term and rejected it. The implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008). Even the most skilled and sophisticated parties will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect." *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010). "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

Gaps also may exist because the parties had "understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)). "The implied covenant is well-suited to

53

imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement." *Dieckman*, 155 A.3d at 361.

When determining how the parties would have agreed to fill a gap, the court looks to the past. "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013) (cleaned up), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 814 n.13 (Del. 2013). A reviewing court does not simply introduce its own notions of what is "fair or reasonable under the circumstances." *Allen*, 113 A.3d at 184. Although the covenant's name includes the concepts of "good faith" and "fair dealing," the doctrine does not impose a "free-floating" requirement that a party act in some morally commendable sense. *Gerber*, 67 A.3d at 418 (cleaned up). When used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract." *Id.* at 419 (cleaned up). The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Id.* (cleaned up). The application of these concepts turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally." *Id.* (cleaned up) (emphasis omitted).

Because of the importance of the plain language of contracts, the Delaware Supreme Court has provided guidance in this area by admonishing against a free-wheeling approach. Invoking the doctrine is a "cautious enterprise." *Nemec*, 991 A.2d at

54

Implying contract terms is an "occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted). Its use should be "rare and fact-intensive, turning on issues of compelling fairness." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

### b. The Implied Covenant And A De-SPAC Merger

The first question under the implied covenant is whether the contract contains a gap that the implied covenant could fill. The Preemptive Option does not identify a de-SPAC merger as a triggering event; it only refers to an Eligible Capital Raise. It is reasonably conceivable that by failing to address a de-SPAC merger, the parties left a gap that could warrant the application of the implied covenant.

The Company argues that no gap exists to be filled because the LLC Agreement (i) gave the Board "sole and exclusive right and authority (in its sole discretion)" to make determinations that fell within its authority, such as approving the merger, (ii) waived the Board's fiduciary duties, and (iii) did not require approval from "any Members or class or group of Members." Dkt. 136 at 24; Ex. 1 § 5.1(b)(ii). They conclude that under this suite of provisions, the Board could do whatever it wanted, in its "sole discretion," without having to obtain approval from any other decision maker, and hence the implied covenant has no role to play. That argument misses the boat. That setting provides more reason for the implied covenant to apply, not less.

The Delaware Supreme Court has made clear that the implied covenant imposes limitations on a party's ability to exercise discretion under an agreement. The implied

covenant generally requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the bargain, and that rule applies with special force "when a contract confers discretion on a party." *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021). At a minimum, the implied covenant requires that the party empowered with the discretion to make a determination "use good faith in making that determination." *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984).

The Delaware Supreme Court also has made clear that the introduction of the term "*sole* discretion" does not eliminate the role of the implied covenant or give a party carte blanche to wield its discretionary authority however it might wish. *Miller v. HCP Trumpet Invs., LLC*, 2018 WL 4600818, at *1, 194 A.3d 908 (Del. 2018) (ORDER) ("The mere vesting of 'sole discretion' did not relieve the [holder of discretion of the] obligation to use that discretion consistently with the implied covenant of good faith and fair dealing."). This court has likewise observed that when a contract grants "sole discretion" to a decision maker, the decision maker must still "exercise that discretion consistent with its covenant of good faith and fair dealing." *Hilco Cap., LP v. Fed. Ins. Co.*, 98 A.2d 174, 178 (Del. 2009). Put differently, "[a] contract which grants one party sole discretion with respect to a material aspect of the agreement may, through the implied covenant of good faith and fair dealing, require that the exercise of discretion be in good faith." *CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *5 n.53 (Del. Ch. Oct. 1, 2012).

Linking these concepts together reveals that the implied covenant requires a party to exercise discretion within the range of possibilities "that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber*, 67 A.3d at 418. To exercise a discretionary right in good faith for purposes of the implied covenant means to do so with "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a (Am. Law Inst. 1981), Westlaw (database updated Oct. 2022).

Having identified a gap that the implied covenant could fill, the next question is whether the gap should be filled. It is possible that during the bargaining over Hudson's investment in the Company, the parties negotiated over whether the Preemptive Option would apply to a de-SPAC merger and rejected that possibility. It is also possible that the parties did not negotiate over the subject. At this stage of the proceeding, the court lacks any insight into the details of the negotiations. Given the procedural posture of the case, Hudson receives the benefit of the inference that the parties did not address the application of the Preemptive Option to a de-SPAC merger and reject Hudson's current position.

The final step in the implied covenant analysis is to evaluate the agreements that the parties reached and the context in which they bargained to determine whether it is reasonably conceivable that the implied covenant could supply the term that the party requests. Hudson argues that under the implied covenant, the merger should trigger the Preemptive Option. Whether that argument is reasonably conceivable depends on the similarity between a de-SPAC merger and an Eligible Capital Raise.

As noted previously, a de-SPAC merger is a way for an operating business to accomplish the twin goals of raising capital and accessing the public markets. It is widely understood to be the functional equivalent of a traditional IPO, albeit blessed with features that practitioners thought were regulatory advantages. Because of the similarity between a de-SPAC merger and an IPO, the most powerful indication of whether the drafters of the of the LLC Agreement would have agreed that Hudson could exercise the Preemptive Option in connection with a de-SPAC Merger is whether they viewed a traditional IPO as an Eligible Capital Raise.

On this point, the LLC Agreement speaks clearly and explicitly: A traditional IPO is not an Eligible Capital Raise. The definition of Eligible Capital Raise excludes the transactions identified in Sections 3.1(c)(i)(B) through 3.1(c)(i)(F) of the LLC Agreement, each of which involves a scenario in which the Company issues equity securities. One of those scenarios is "Equity Securities issued . . . pursuant to a Public Offering." Ex. 1 § 3.1(c)(i)(C). Elsewhere, the LLC agreement defines a "Public Offering" as "any underwritten sale of common equity securities of the Company (or any corporate successor thereto) pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission." *Id.* at 10. The same section excludes "Equity Securities issued pursuant to a Corporate Conversion effected in accordance with Section 9.9 of this Agreement or otherwise." *Id.* Section 9.9 authorizes the Board to effectuate a Corporate Conversion, which generally involves an initial public offering accomplished in conjunction with the conversion of the Company into a corporate form. *Id.* § 9.9(a). Section 9.9(b) expressly recognizes that the corporate

58

conversion may happen "by conversion . . ., merger or consolidation into any entity, recapitalization or otherwise." *Id.* § 9.9(b).

The merger concededly is not a Public Offering. The merger is a de-SPAC merger, not an underwritten sale of common equity securities. And although the merger does involve the conversion of the Company into a corporation through a merger, the terms of the merger do not satisfy all of the conditions for a Corporate Conversion, which require (among other things) that the conversion "giv[es] effect to the same economic, voting and corporate governance provisions" found in the LLC Agreement. *Id.*

Despite these differences, the express exclusion of a Public Offering and a Corporate Conversion from the definition of an Eligible Capital Raise that could trigger the Preemptive Option provides a powerful indication that if they had negotiated over the issue, the parties would *not* have treated a de-SPAC merger as a triggering event for the Preemptive Option. Having excluded the most conceptually similar transactions, it is not reasonably conceivable that the parties would have agreed that a de-SPAC merger would trigger the Preemptive Option.

Hudson's theory based on the implied covenant therefore does not state a claim on which relief can be granted.[8]

---

[8] The complaint contains an off-hand reference to the merger violating "Hudson's preemptive rights under Section 3.1(c) of the LLC Agreement to purchase newly issued equity." AC ¶ 99. Hudson has not articulated how Section 3.1(c) could give Hudson a preemptive right in connection with the de-SPAC merger, and it is not reasonably conceivable that the provision could apply. Subject to a lengthy list of exceptions, including for a Public Sale, Section 3.1(c) grants existing members a preemptive right "if

59

**H.    The Governance Claims**

In its last two claims for breach of the LLC Agreement, Hudson focuses on how the Hudson Managers were treated during the period leading up to the merger. Hudson describes how the Company's management team and Chicago Pacific operated on their own, without involving the full Board, and thereby excluded the Hudson Managers from the process. Hudson identifies requests for information that the Company failed to fulfill as well as decisions that the Hudson Managers and the full Board were asked to make on short time frames with limited information. On two occasions, the Company's management sought Board approval, then within hours took the position that the silence of managers who had not responded functioned as consent. The fact pattern that Hudson has alleged supports two claims on which relief can be granted.

**1.    The Failure To Provide The Hudson Managers With Information**

Hudson's penultimate claim for breach of contract asserts that the Company failed to honor the Hudson Managers' informational rights. AC ¶ 119. This theory states a claim on which relief can be granted.

Section 7.5 of the LLC Agreement provides that "[e]ach Manager shall have the right to receive and to disclose to such Manager's appointing Member . . . any other information reasonably requested by such Manager." Ex. 1 § 7.5. In addition, under

the Company sells or offers to sell any Equity Securities (including Units) to any Person." Ex. 1 § 3.1(c). For the same reasons that the merger does not trigger the Preemptive Option, the merger does not trigger the more general preemptive right in Section 3.1(c).

Section 18-305 of the LLC Act, a manager of an LLC "shall have the right to examine all of the information described in subsection (a) of this section for a purpose reasonably related to the position of manager." 6 *Del. C.* § 18-305(b). The information listed in Section 18-305(a) consists of:

> (1) True and full information regarding the status of the business and financial condition of the limited liability company;
>
> (2) Promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year;
>
> (3) A current list of the name and last known business, residence or mailing address of each member and manager;
>
> (4) A copy of any written limited liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the limited liability company agreement and any certificate and all amendments thereto have been executed;
>
> (5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and
>
> (6) Other information regarding the affairs of the limited liability company as is just and reasonable.

*Id.* § 18-305(a).

A manager of an LLC possesses informational access rights that parallel those enjoyed by a director of a corporation. A director's access to information is "essentially unfettered." *Milstein v. DEC Ins. Brokerage Corp.*, C.A. Nos. 17586 and 17587 (Del. Ch. Feb. 1, 2000) (TRANSCRIPT), *quoted in Schoon v. Troy Corp.*, 2006 WL 1851481, at *1, n.8 (Del. Ch. Jun. 27, 2006)). As a member of the governing body charged by statute with directing and overseeing the business and affairs of an entity, a director must have

access to the corporation's books and records to fulfill those duties. *See Holdgreiwe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *3 (Del. Ch. Apr. 29, 1993). The right includes "equal access to board information." *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at *5 (Del. Ch. June 4, 1996) (internal quotations omitted). Put differently, "a sitting director is entitled to . . . receive whatever the other directors are given." *Intrieri v. Avatex Corp.*, 1998 WL 326608, at *1 (Del. Ch. June 12, 1998). A company "cannot pick and choose which directors will receive [which] information." *Hall v. Search Cap. Gp., Inc.*, 1996 WL 696921, at *2 (Del. Ch. Nov. 15, 1996).

A director seeking to inspect books and records makes out a *prima facie* case by showing that he is a director, that he requested information, and that the request was refused. *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 129 (Del. Ch. 1969). At that point, the corporation bears the burden of proving that the director does not have a proper purpose for the inspection. *Holdgreiwe*, 1993 WL 144604, at *3. The LLC Act departs from these principles by placing an additional burden on the manager to establish "[t]hat the information the demanding . . . manager seeks is reasonably related to . . . the manager's position as a manager." 6 *Del. C.* § 18-305(f)(2). The LLC Act also authorizes a greater degree of private ordering by providing that "[t]he rights of a . . . manager to obtain or examine information as provided in this section may be expanded or restricted in an original limited liability company agreement or in any subsequent amendment approved or adopted by all of the members or in compliance with any applicable requirements of the limited liability company agreement." *Id.* § 18-305(g).

The complaint identifies situations in which the Hudson Managers requested information and did not receive it.

- Between March 4 and March 25, 2021, the Hudson Managers repeatedly asked to see any draft letter of intent from Foresight. Chicago Pacific barred the Company from sharing the draft with the Hudson Managers. AC ¶ 43.

- After the denial of the preliminary injunction, the Hudson Managers continued to request updates about the merger, but Hudson did not receive the information it sought. *Id.* ¶ 86. Hudson specifically asked about the level of redemptions that the Company anticipated. They did not receive a meaningful response.

- During the weeks before closing the merger, Hudson asked the Company for a spreadsheet showing the flow of funds in the merger. The Company did not provide a spreadsheet until November 26, 2021. *Id.* ¶ 91.

These allegations are sufficient to support a claim on which relief can be granted.

To defeat Hudson's claim for breach of its informational rights, the Company asserts that Hudson has failed to plead any cognizable monetary damages. Dkt. 136 at 29. The Company also contends that because Hudson obtained extensive information through discovery in this litigation, Hudson's claim is moot. *Id.*

The Company starts from an incorrect premise. As discussed previously, a party need not plead cognizable damages as an element of a claim for breach of contract. All that is required is cognizable harm, and the breach of a contract right gives rise to cognizable harm. *See AB Stable*, 2020 WL 7024929, at *47. If nothing else, the court can award nominal damages.[9]

---

[9] *Garfield*, 277 A.3d at 328 ("[A] court can vindicate a breach of contract that does not give rise to monetary damages through an award of nominal damages."); *Ivize*, 2009 WL 1111179, at *12 ("Even if compensatory damages cannot be or have not been

When informational rights are at issue, those principles apply with particular force. The value of an informational right lies in a party's ability to obtain information in real time, during a deliberative process, then use that information to affect the outcome of the discussions. Delaware's model of board deliberations rests on the idea that a single director can change the other directors' minds. The loss of the opportunity to participate in the deliberative process constitutes harm.

That construct also explains why it does not matter that Hudson was able to obtain voluminous information through discovery in this litigation. A lawsuit is not a substitute for boardroom discussion and debate.

In this case, Hudson has gone further and explained why events might have gone differently if the Hudson Managers had been given greater access to information in real time, as part of the deliberative process. Hudson operates in the healthcare industry and has a history of successful investments. Hudson also has contacts with SPAC sponsors other than Foresight. If Hudson had received timely information about key developments in the negotiations, such as the aggressive positions that Foresight was taking, the decline in the pro forma value of the post-transaction entity, or the shrinking size of the PIPE, then Hudson could have provided constructive input that could have taken the discussions

---

demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."); *see* Restatement (Second) of Contracts § 346 cmt. b (Am. L. Inst. 1981), Westlaw (database updated Oct. 2022) ("Although a breach of contract by a party against whom it is enforceable always gives rise to a claim for damages, there are instances in which the breach causes no loss. . . . In all these instances the injured party will nevertheless get judgment for nominal damages.").

in a different direction. Hudson tried to introduce other potential SPAC sponsors to the Board. *See* PX 38 at '572. With timely access to the information that the Hudson Managers requested, Hudson might have helped the Company achieve a better deal. The fact that the complaint does not attempt to put a dollar figure on Hudson's damages is not a basis for dismissal.

### 2. The Failure To Permit The Hudson Managers To Participate In The Planning Of The Merger

In its final claim for breach of contract, Hudson asserts that the Company breached the implied covenant of good faith and fair dealing by excluding the Hudson Managers from the planning of the merger. They maintain that the Chicago Pacific Managers and the Company co-founders put together the deal with Foresight without involving the Hudson Managers in the process. They claim that the Company only involved the Hudson Managers when absolutely necessary, such as when the Board took formal action. At the pleading stage, this theory states a claim on which relief can be granted.

There is no express provision in the LLC Agreement that gives the Hudson Managers the right to participate outside of board meetings in the management of the Company or in the development and negotiation of major transactions. And that makes sense. In an entity with operations of any significance, it will not be practical for members of the governing body to be involved in the day-to-day business of the entity. That is the domain of officers and employees. *See* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 36 (2015).

65

But as with any generally sound principle of law, the rule that applies in the majority of cases may not work in the extreme case. If virtually everything happens outside of the boardroom with the board only consulted as a rubber stamp, then the governing body of the entity is not really governing the entity, and the members of the governing body are being deprived of their entitlement to direct and oversee its business and affairs.

If the Company were a corporation, then Hudson's theory would invoke Section 141(a) of the Delaware General Corporation Law (the "DGCL"). "By vesting corporate power in the board of directors, section 141(a) implies that it is the board collectively as a deliberative body, and not a particular subset of directors, that must exercise its authority. A board only can act properly after there has been an opportunity for all directors to participate in the board's decision-making process." Laster & Zeberkiewicz, *supra*, at 36–37; *see, e.g.*, *Lippman v. Kehoe Stenograph Co.*, 95 A. 895, 899 (Del. Ch. 1915) ("Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered.").

Hudson's theory also would rest on structural features of the DGCL, such as the inability of directors to act except at a duly convened meeting or through action by unanimous written consent. *See* 8 *Del. C.* § 141(b), (f). "The requirement of unanimity for action without a meeting is perhaps the strongest manifestation of the DGCL's expectation that every director will have the opportunity to participate in board decision-making. If collective director participation were unimportant, then the delivery of affirmative consents by the number of directors sufficient to take action at a meeting at

66

which all directors were present should constitute board action." Laster & Zeberkiewicz, *supra*, at 38. The requirement of unanimous written consent applies even if particular directors arguably have a disabling self-interest. *Solstice Cap. II, Ltd. P'ship v. Ritz*, 2004 WL 765939, at *1 (Del. Ch. Apr. 6, 2004). The statute requires "unanimity of the entire board, not just the unanimity of the disinterested directors." *Id.*

One consequence of the deliberative model is that "all directors must have the opportunity to participate meaningfully in any matter brought before the board and to discharge their oversight responsibilities." *OptimisCorp v. Waite*, 2016 WL 2585871, at *3 n.8, 137 A.3d 970 (Del. 2015) (TABLE) (cleaned up). As discussed above, a company "cannot pick and choose which directors will receive [which] information." *Hall*, 1996 WL 696921, at *2; *accord Kalisman v. Friedman*, 2013 WL 1668205, at *4 (Del. Ch. Apr. 17, 2013). If some directors have had their hands deep in the dough of a major transaction and are intimately familiar with its details, then the company must ensure that other directors have sufficient information to participate meaningfully in the decision-making process.

The Company is an LLC, so before applying these principles, the court must focus on the LLC Agreement. Under the LLC Act, "parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members." *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009). "Virtually any management structure may be implemented through the company's governing instrument." Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds &*

*O'Toole on Delaware Limited Liability Companies* § 9.01[B], at 9-9 (2d ed. & Supp.

2018).

> Using the contractual freedom that the LLC Act bestows, the drafters of an LLC agreement can create an LLC with bespoke governance features or design an LLC that mimics the governance features of another familiar type of entity. The choices that the drafters make have consequences. If the drafters have embraced the statutory default rule of a member-managed governance arrangement, which has strong functional and historical ties to the general partnership (albeit with limited liability for the members), then the parties should expect a court to draw on analogies to partnership law. If the drafters have opted for a single managing member with other generally passive, non-managing members, a structure closely resembling and often used as an alternative to a limited partnership, then the parties should expect a court to draw on analogies to limited partnership law. If the drafters have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law. Depending on the terms of the agreement, analogies to other legal relationships may also be informative.

*Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) (cleaned up); *accord*

*Freeman Fam. LLC v. Park Ave. Landing LLC*, 2019 WL 1966808, at *4 (Del. Ch. Apr.

30, 2019).

For purposes of the Company, corporate principles are informative. The LLC

Agreement establishes a corporate-like structure under which "the Board shall conduct,

direct and exercise full control over all activities of the Company." Ex. 1 § 5.1(a). The

LLC Agreement provides for the Board to act at a regular or special meeting by a

majority of the managers then in office, with a majority of the managers then in office

constituting a quorum for Board action. *Id.* § 5.3. Although the LLC Agreement

contemplates that the Board may act by non-unanimous written consent if the consent is

approved by the minimum number of votes that would be necessary to take that action at

a meeting, the LLC Agreement also requires that the consent receive the affirmative votes of the Hudson Managers. *Id.* As to the Hudson Managers, therefore, the Company operates using corporate principles that prevent the Board from acting without the meaningful participation of the Hudson Managers.

Hudson contends that in light of the structure of the Company and analogous corporate principles, the Company violated the implied covenant of good faith and fair dealing by excluding the Hudson Managers from the development, planning, and negotiation of the merger. *See* AC ¶ 122. At the pleading stage, based on the allegations about how the Company treated the Hudson Managers, Hudson has stated a claim on which relief can be granted.

For starters, Hudson has identified a gap. The LLC Agreement does not expressly require that all managers receive substantially the same information as all other managers or that they have a meaningful opportunity to participate in strategic decisions. *Id.*

Second, it is reasonably conceivable that the implied covenant should supply a term to fill the gap. The implied covenant is well suited to addressing "understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." *Katz*, 508 A.2d at 880. The premise that the Hudson Managers would have a meaningful opportunity to participate in strategic decisions and receive substantially the same information as all other managers is just such an expectation. Ask yourself what would have happened during the negotiations over Hudson's investment in the Company, if Chicago Pacific and the Company officers had proposed that they could initiate, plan, and negotiate the terms of a merger that would transform the nature of Hudson's

investment and take the Company public, then present it to the Board on a short fuse for approval without answering the Hudson Managers' questions. Not only would Hudson have rejected that position out of hand, but the proposal would have been so extreme as to undermine the credibility of Chicago Pacific and the Company's officers in the negotiations. No one needed to raise the idea for everyone to know it was out of bounds. It is reasonably conceivable that the parties negotiated based on a shared foundational understanding that all managers, including the Hudson Managers, would have a meaningful opportunity to participate in Board deliberations.

Third, it is reasonably conceivable that the court can supply a meaningful implied term by drawing on principles of corporate law.

In this case, Hudson asserts that the Hudson Managers were excluded from the process of developing and negotiating the merger to a degree that deprived them of their ability to exercise their responsibilities as managers. In advancing its theory, Hudson stresses that other members of the Board—most notably the Chicago Pacific Managers—were fully involved in the process and received access to information in real time. And Hudson points out that even individuals associated with Chicago Pacific who were not managers—such as Sameer Mathur—were fully incorporated in the process while the Hudson Managers were not.

It bears emphasizing that the degree of exclusion appears extreme. The court understands the fact that management often takes the lead role in developing and negotiating transactions. The court also understands that a controlling investor like Chicago Pacific frequently will be involved in the negotiations, while minority investors

often will not. In this case, however, Hudson has alleged a pattern of conduct which, at the pleading stage, supports an inference of an intentional effort to negate the Hudson Managers' ability to participate in the governance of the Company. For example:

- In February 2021, after Foresight had completed its IPO, the Company's senior officers and representatives of Chicago Pacific engaged with Foresight. They kept the Hudson Managers in the dark. AC ¶ 34.

- On February 15, 2021, the Company and Foresight executed a non-disclosure agreement, and four days later, the Company opened a data room for Foresight. No one told the Hudson Managers. *Id.*

- On March 5, 2021, JPMorgan provided a timeline for a de-SPAC merger to representatives of Chicago Pacific and the Company. PX 57 at '801. JPMorgan did not share the timeline with the Hudson Managers.

- On March 12, 2021, Abdou sent an email to the Board stating that he would be signing an exclusivity agreement with Foresight effective that same day. After four Board members replied, Abdou saw no need to wait for more input. He wrote back, "hearing no objections, we're now exclusive." PX 67 at '844. The fast turnaround prevented the Hudson Managers from participating in a meaningful discussion about exclusivity. AC ¶ 43.

- Between March 4 and March 25, 2021, the Hudson Managers repeatedly asked to see any draft letter of intent from Foresight. Chicago Pacific barred the Company from sharing the draft with the Hudson Managers. *Id.*

- On March 25, 2021, Puathasnanon sent the Board a proposed letter of intent with Foresight and asked the Board to approve it. Before the Hudson Managers could respond, Abdou sent a follow-up email in which he stated that he "[would] take [the Board's] lack of response as implicit approval." *Id.* ¶ 47. Abdou signed the letter of intent at the end of the day on March 25. *Id.* ¶ 48. The fast turnaround prevented the Hudson Managers from participating in a meaningful discussion about the letter of intent.

- On March 30, 2021, Kazarian instructed Puathasnanon to provide the Hudson Managers with a "short" memorandum about the de-SPAC merger that contained different information than the "long" memorandum that other managers received. *Id.*

- On March 31, 2021, the Hudson Managers received for the first time a proposed resolution declaring that the de-SPAC merger was a "strategic transaction" and hence

71

not subject to the Preemptive Option. *Id.* ¶ 60. Chicago Pacific and the Company's senior officers had been working on the concept for over a week without providing any information to the Hudson Managers. During a meeting on April 2, a majority of the Board adopted the resolution. *Id.* ¶ 63. The lack of prior information prevented the Hudson Managers from participating in a meaningful discussion about the letter of intent.

- On April 29, 2021, Company management informed the Board that the Company intended to engage in a de-SPAC merger with Foresight. For the next month, the Board did not receive any meaningful information about the transaction or its progress. *Id.* ¶ 76.

- On May 7, 2021, Tolan and Kazarian invested in another SPAC that Wasson was sponsoring. They did not tell the Board. *Id.* ¶ 75.

- No one provided the Board in real time with information about the decline in the size of the PIPE. The Hudson Managers did not learn about the drop in PIPE funding until days before the vote on the merger. *Id.* ¶ 78–79.

- No one provided the Board in real time with information about the reduction in the valuation of the post-transaction entity. The Hudson Managers did not learn about that change until days before the vote on the merger. *Id.*

- On May 20, 2021, after nearly one month of silence, the Company noticed two meetings at which the Board would consider the merger. This was the first time that the Hudson Managers learned about the structure of the transaction, the significant reduction in the PIPE, and the one-third lower valuation for the post-transaction entity. *Id.*

- After the Hudson Managers asked a series of questions, the Board delayed the vote on the merger and scheduled an additional meeting for 7:00 a.m. on Tuesday, May 25, 2021. PX 136 at '786.

- The Company circulated the final deal documents at 1:41 a.m. on May 25, 2021, for a meeting that was scheduled to begin less than six hours later. The documents included two self-described "material" changes to the merger. AC ¶ 80. The Hudson Managers abstained from the vote, citing a lack of time to review the final documents. AC ¶ 82.

- In November 2021, Foresight's accountants expressed concern to Chicago Pacific and the Company about how to characterize the merger for tax purposes. *Id.* ¶ 89. No one told the Hudson Managers about the accountants' concerns.

72

- While the Company was negotiating with the accountants, a multi-million-dollar investor pulled its investment from the PIPE. No one informed the Hudson Managers about the lost investor until the night before the merger closed. *Id.* ¶ 90.

That is quite a list. And Hudson does not merely recite how the Hudson Managers were frozen out of the process. Hudson also explains that if the Hudson Managers had been part of meaningful, Board-level deliberations, then they would have pushed for important changes that could have resulted in a superior transaction, including:

- an expanded market canvass that included SPACs other than Foresight;

- an audit of Foresight;

- an assessment of the regulatory ramifications of a de-SPAC merger;

- the preparation of reliable management projections for the combined company;

- a fairness opinion;

- a completed audit for 2020; and

- consideration of alternatives to the de-SPAC merger in light of the drop in PIPE financing, the lowered valuation for the combined company, and the aggressive terms that Foresight demanded.

*Id.* ¶ 83. Yet because they were excluded from the process, the Hudson Managers were not able to engage in meaningful discussions with the other members of the Board on these points.

In response these detailed allegations, the Company again argues that Hudson has failed to allege cognizable damages. The same response holds. It remains to be seen whether Hudson can prove any quantifiable damages based on the governance violations that Hudson has identified. But Hudson does not have to plead quantifiable damages at the pleading stage. Hudson has shown legally cognizable harm, which is sufficient.

Hudson's claim for breach of the implied covenant based on the exclusion of the Hudson Managers from the process of planning, developing, and negotiating the merger states a claim on which relief can be granted. Many factual issues lie ahead, and the outcome will turn on the extent to which Hudson proves that the Company excluded the Hudson Managers from the process and whether the degree of exclusion was so great as to impair the ability of the Hudson Managers to participate meaningfully in the Company's governance. Those issues cannot be resolved at the pleading stage.

## III.    CONCLUSION

The motion to dismiss Counts I–IV of the complaint is granted in part. The claims in those counts against Foresight and Chicago Pacific are dismissed in their entirety. The claims against the Company are dismissed to the extent set forth in this opinion.